**GREENSTEIN, LOGAN & COMPANY, et al., Appellants,**

v.

**BURGESS MARKETING, INC., et al., Appellees.**

**No. 10–87–005–CV.**

Court of Appeals of Texas, Waco.

Nov. 5, 1987.

Rehearing Denied Dec. 3, 1987.

F. Glenn Smith, III and Guy M. Hohmann, Brill & Brooks, Scott Douglas Cunningham, Brown & Fowler, P.C., Houston, for appellant.

Jim Meyer, Dunnam, Dunnam, Horner & Meyer, Waco, for appellee.

## OPINION

THOMAS, Justice.

This suit is for accounting malpractice. Burgess Marketing, Inc., the plaintiff, obtained a $3,605,000 judgment against the accounting firm of Greenstein, Logan & Company and six of its partners, the defendants, based on jury findings of negligence and proximate cause. The accountants contend the judgment should be reversed because the court abused its discretion when it made various discovery rulings, refused to grant them a continuance, dismissed their RICO [1] claims for lack of jurisdiction, excluded material evidence, and refused to submit their requested issues. They also argue the court erred when it overruled their objections to the proximate-cause issues in the charge, allowed Burgess Marketing to file a last-minute trial amendment, and refused to enter a judgment in their favor notwithstanding the verdict. Finally, they complain that the damages are excessive. The judgment will be affirmed because none of these contentions can be sustained.

Burgess Marketing, whose principal owner is Jack Burgess, sells gasoline and other fuels in Central Texas through convenience stores it owns or leases. Greenstein Logan had performed Burgess Marketing's annual audit since the company's inception in 1970. Burgess Marketing hired Norman Dunham, one of Greenstein Logan's certified public accountants, as its comptroller in August 1982. From September 1982 until he was fired as comptroller in July 1985, Dunham underaccrued and underpaid Burgess Marketing's federal excise tax. Greenstein Logan failed to discover Dunham's error during the 1984 and 1985 audits.

When Dunham's successor at Burgess Marketing discovered the underpayment in September 1985, Burgess fired Greenstein Logan and employed Patillo, Brown & Hill to determine the amount of the tax delinquency. Patillo Brown's investigation revealed that the audited financial statements prepared by Greenstein Logan for 1984 and 1985 had grossly understated Burgess Marketing's excise-tax liability and expense and overstated its net profit and net worth. Patillo Brown found that the company owed approximately $1,177,000 in delinquent excise taxes on March 31, 1985, and not $137,473 as shown on the 1985 audited financial statements prepared

1. *See* 18 U.S.C.A. §§ 1961–1968 (West 1984).

by Greenstein Logan. Furthermore, Patillo Brown estimated that the tax delinquency, excluding penalties and interest, had increased to approximately $1,650,000 by September 30, 1985. Instead of a net profit and a positive net worth, as shown on the audited financial statements prepared by Greenstein Logan, Burgess Marketing actually had been operating at a substantial monthly deficit, was bankrupt, and had a negative net worth of − $1,700,000. The Internal Revenue Service levied a $2,700,000 tax lien against Burgess individually and Burgess Marketing's assets in May 1986 for the delinquent tax, penalties and interest.

Burgess, his wife and Burgess Marketing sued Greenstein Logan and six of its partners, Curtis Logan, James Brockway, Robert Lindover, Russell Chupik, Gary Bonds, and Barbara McKittnick, for accounting malpractice. They asserted, among other theories of recovery, that Burgess Marketing's damages had been proximately caused by Greenstein Logan's negligent conduct. However, Greenstein Logan contended that Burgess and Dunham had intentionally underpaid the excise tax and then used the tax money to finance Burgess Marketing's expansion into the convenience stores and to cover Burgess' personal losses in other business ventures. The defense argued that Burgess and Burgess Marketing had merely "borrowed" the excise taxes from the federal government when conventional lenders refused to lend them the money they needed. To cover up their scheme, Greenstein Logan alleged, Burgess and Dunham intentionally and fraudulently concealed the underpayment of the excise tax during the 1984 and 1985 audits. Greenstein Logan also alleged that Burgess was negligent when he failed to properly supervise Dunham and failed to detect the underpayment when he reviewed the monthly financial statements that Dunham had prepared.

The jury found that Greenstein Logan had negligently misrepresented Dunham's competence as an accountant before he was hired as Burgess Marketing's comptroller, that it had negligently failed to perform the 1984 and 1985 audits in accordance with generally accepted auditing standards, and that its negligence had proximately caused Burgess Marketing to suffer $3,500,000 in damages. The jury also awarded the company $120,000 in reasonable attorney's fees at the trial and appellate levels.

■ The trial began on September 29, 1986. Greenstein Logan's first complaint is that the court abused its discretion when it entered an order on September 12, allowing Burgess Marketing until September 17 to produce reports of its experts and postponing the deposition of one of Burgess Marketing's experts until September 22. It argues that the September 12 order violated its right under Rule 166b(5) to have Burgess Marketing designate its experts and disclose the substance of their opinions more than thirty days prior to the trial. *See* Tex.R.Civ.P. 166b(5). A statement of facts of the September 12 hearing is not included in the appellate record. Abuse of discretion is an issue that cannot be determined without a record of the discovery hearing. *See Vestal v. Jackson,* 598 S.W. 2d 724, 726 (Tex.Civ.App.—Waco 1980, no writ).

■ Greenstein Logan apparently contends under point one that the court, acting on its own and without any objection, should not have allowed three of Burgess Marketing's experts to testify because either their indentity or their opinions had not been timely disclosed under Rule 166b(5). It bases this contention on the rule that the testimony of a late-designated expert is "automatically" excluded by Rule 215(5). *See* Tex.R.Civ.P. 215(5); *Morrow v. H.E.B., Inc.,* 714 S.W.2d 297 (Tex.1986). Such an interpretation of the automatic-exclusion rule in *Morrow,* if adopted, would encourage a party to keep silent, await a favorable verdict, and then appeal an adverse judgment on the ground that the court had failed, on its own, to prevent a late-designated expert from testifying. A more prudent and logical interpretation of the rule in *Morrow* is that the court must, upon a timely and proper objection, "automatically" exclude the testimony of a late-

designated expert, if the party offering it does not prove that a good cause exists for its inclusion. *See Morrow*, 714 S.W.2d at 298. Greenstein Logan, which did not object to any of Burgess Marketing's experts testifying when called as witnesses, has waived any complaint that their testimony should have been excluded under Rule 215(5). *See Southwestern Bell Tel. Co. v. Davis*, 582 S.W.2d 191, 194 (Tex.Civ.App.—Waco 1979, no writ). Point one is overruled.

On March 31, 1986, Greenstein Logan originally answered a written interrogatory inquiring about its expert witnesses by stating that "no expert has been retained to date." It supplemented this answer on August 29 by designating twelve expert witnesses, and concluded the supplementation with the following statement: "After we take the depositions of the Plaintiff's experts ... we may have rebuttal experts." On September 24, five days before trial, Greenstein Logan designated Bill Carden, Ray Perryman and Carey Maness as "rebuttal expert witnesses." However, the court granted Burgess Marketing's motion in limine to suppress their testimony because they had not been timely identified under Rule 166b(5).

■ A party must identify any expert whose identity or opinion has not been previously disclosed in response to an appropriate inquiry. Tex.R.Civ.P. 166b(5)(b). Supplementation of the prior answer must occur at least thirty days before the trial, unless the court finds that a "good cause" exists for a later supplementation. *Id.* What constitutes "good cause" is within the court's discretion, and its decision on the issue will not be set aside except for an abuse of discretion. *Morrow*, 714 S.W.2d at 298.

Greenstein Logan bases the second point on the purported exclusion of the testimony of its three so-called "rebuttal" experts. It contends the evidence conclusively proved that a good cause existed for their late designation because the September 12 order did not allow access to the reports, calculations, and names of Burgess Marketing's damage experts until just a few days before the trial. Greenstein Logan also insists that rebuttal experts do not have to be designated more than thirty days prior to trial under Rule 166b(5).

■ An appellate court never reaches the question of whether evidence was erroneously excluded unless the complaint has first been properly preserved for review. *See McInnes v. Yamaha Motor Corp., U.S.A.*, 673 S.W.2d 185, 187 (Tex.1984). Thus, the initial question is whether Greenstein Logan properly preserved any complaint about the exclusion of the three experts' testimony. Rule 52 of the Rules of Appellate Procedure prescribes two methods for preserving error arising from the exclusion of testimony when, as here, an offer of proof is necessary. *See* Tex.R. App.P. 52(b), (c). The first is by an informal bill of exception made before the court reporter. *Id.* at 52(b). The second method is by a formal bill of exception. *Id.* at 52(c). Furthermore, a party complaining about the exclusion of evidence must, either by an informal or formal bill, show the substance of what was excluded. *Gulf Paving Co. v. Lofstedt*, 144 Tex. 17, 188 S.W.2d 155, 159 (1945). Likewise, he must show by a bill of exception that the evidence was actually offered and excluded. *See Brown v. American Transfer & Storage Co.*, 601 S.W.2d 931, 936 (Tex.1980).

■ The record does not reflect that Greenstein Logan ever offered Perryman's or Maness' testimony during the trial. Consequently, any complaint about the exclusion of their testimony has not been preserved. *See Brown*, 601 S.W.2d at 936. However, the offer, rejection and substance of Carden's testimony was preserved in an informal bill, and the question under the second point thus narrows to whether the court abused its discretion when it excluded his testimony.

■ Greenstein Logan argues that Carden's testimony was admissible to "rebut" the evidence on damages that Burgess Marketing introduced during its case in chief, even though Carden had not been designated as an expert more than thirty days prior to the trial. It relies on *Gan-*

*nett Outdoor Co. of Texas v. Kubeczka,* 710 S.W.2d 79, 84 (Tex.App.—Houston [14th Dist.] 1986, no writ), and *Temple v. Zimmer U.S.A., Inc.,* 678 S.W.2d 723, 724 (Tex.App.—Houston [14th Dist.] 1984, no writ), to support its contention that Rule 166b(5) does not apply to a rebuttal expert. Greenstein Logan interprets the holdings in these cases too broadly. The appellate court recognized in both opinions that a court can either allow or refuse to allow a previously unidentified expert to testify on rebuttal, and merely reviewed the court's decision in each case for an abuse of discretion. The contention that Rule 166b(5) cannot apply to an unidentified rebuttal expert is rejected.

 However, assuming that Rule 166b(5) does not apply to rebuttal experts, that assumption would not aid Greenstein Logan because Carden was not a "rebuttal" witness. Rebuttal testimony can be introduced only after the parties have closed the evidence offered in chief. *See* Tex.R.Civ.P. 265. They must then limit their rebuttal to those issues which were placed in conflict by the adverse party's evidence during the case in chief. *See id.* at 265(f); *Ayers v. Harris,* 77 Tex. 108, 13 S.W. 768, 773 (1890). Greenstein Logan offered Carden's testimony during the presentation of its defense in chief. Because a conflict on damages had not developed in the evidence before his testimony was offered and the parties had not yet rested their cases in chief, there was nothing for Carden to rebut. *See Ayers,* 13 S.W. at 773. Therefore, Rule 166b(5) was applicable because Carden was not a rebuttal witness.

 Greenstein Logan's good-cause argument for the late designation of Carden is stated in its brief:

[Greenstein Logan] could not designate its rebuttal experts on damages until it received the names of [Burgess Marketing's] damage experts, the substance of their testimony, and the reports containing their calculations. [By allowing] the reports to be filed in the last days before trial [the court] prejudiced [Greenstein

Logan's] timing and ability to designate its witnesses in rebuttal.

This argument necessarily assumes that the court abused its discretion when it entered the September 12 order, a contention already rejected under the first point. Greenstein Logan did not introduce evidence of any reason or circumstance, other than that given above, which would amount to a good cause for Carden's late designation. Therefore, the court did not abuse its discretion when it excluded his testimony. *See Morrow,* 714 S.W.2d at 298. Point two is overruled.

 Greenstein Logan complains in the third point about the denial of its motion for a continuance on the morning the trial began. Whether a motion for a continuance should be granted or denied is within the court's sound discretion, and its decision will not be reversed except for a clear abuse of discretion. *Villegas v. Carter,* 711 S.W.2d 624, 626 (Tex.1986). Generally, a court is presumed to have correctly exercised its discretion when it denies a motion that fails to comply with the rules governing continuances. *See id.; Garcia v. Texas Emp. Ins. Ass'n,* 622 S.W.2d 626, 630 (Tex.App.—Amarillo 1981, writ ref'd n.r.e.) (cited with approval in *Villegas,* 711 S.W.2d at 626). Greenstein Logan's motion did not comply with Rules 251 or 252 because it was not verified. *See* Tex.R.Civ.P. 251, 252. Therefore, the court is presumed to have acted correctly when it denied the motion. Although Greenstein Logan apparently filed a verified motion after the court denied its unverified motion, the record does not reflect that the verified motion was ever brought to the court's attention or denied. A court is not required to consider a motion that is not called to its attention. *Eddleman v. McGlathery,* 74 Tex. 280, 11 S.W. 1100, 1101 (1889). Point three is overruled.

Greenstein Logan alleged in an amended answer and counterclaim that Burgess Marketing and Jack Burgess had violated the Racketeer Influenced and Corrupt Organization Act, generally known as "RICO", in several instances. *See* 18 U.S. C.A. §§ 1961–1968 (West 1984). The RICO

violations were plead as a defense and as a counterclaim for civil damages. *See id.* at § 1964(c). Burgess Marketing excepted to the allegations on the ground that state courts do not have subject-matter jurisdiction of RICO violations. The court sustained the special exception and dismissed the RICO allegations both as a defense and counterclaim. Greenstein Logan contends in point four that the court abused its discretion in doing so.

Two questions are inherent in this point. First, do state courts have concurrent jurisdiction with the federal courts of RICO violations? Second, if state courts lack such jurisdiction, could the court dismiss the RICO allegations based on Burgess Marketing's special exception without first giving Greenstein Logan an opportunity to amend its pleading? The first question was decided by a Texas court in *Main Rusk Associates v. Interior Space Const.,* 699 S.W.2d 305, 306 (Tex.App.—Houston [1st Dist.] 1985, no writ), when it held: "[W]ithin the structure and language of the [RICO] Act, Congress has implicitly granted exclusive jurisdiction to the federal courts. Such implication is unmistakable from our review of the Act's legislative history and underlying policies." Two federal district courts in Texas have also ruled that federal courts have exclusive jurisdiction of all RICO claims. *See Cacioppe v. Superior Holsteins III, Ltd.,* 650 F.Supp. 607, 608 n. 1, 2 (S.D.Tex.1986) (citing *Broadway* and *Main Rusk Associates* as the basis for its holding); *Broadway v. San Antonio Shoe, Inc.,* 643 F.Supp. 584, 586 (S.D.Tex.1986). Greenstein Logan points to contrary holdings in other jurisdictions. *See e.g., Contemporary Services v. Universal City Studios,* 655 F.Supp. 885, 893 (C.D.Cal.1987); *HMK Corp. v. Walsey,* 637 F.Supp. 710, 717 (E.D.Va. 1986); *Luebke v. Marine Nat. Bank of Neenah,* 567 F.Supp. 1460, 1462 (E.D.Wis. 1983). However, the rationale and holdings in *Main Rusk Associates, Broadway,* and *Cacioppe* are more persuasive and will be followed. The court correctly determined that it lacked subject-matter jurisdiction of Greenstein Logan's RICO claims.

Having decided the jurisdictional question, the second question is more easily answered. Ordinarily, a special exception may only be used to attack pleading defects that are curable by an amendment. *See Texas Department of Corrections v. Herring,* 513 S.W.2d 6, 9–10 (Tex. 1974). However, a special exception can also be used to challenge the court's jurisdiction when the jurisdictional defect appears on the face of a pleading. *See Foster v. Roseberry,* 98 Tex. 138, 81 S.W. 521, 523 (1904). The court could dismiss the RICO allegations based on the special exception because the jurisdictional defect was apparent on the face of Greenstein Logan's pleading.

Furthermore, a pleading must be judged by its substance and not by its label. *See* Tex.R.Civ.P. 71; *Austin Neighborhoods Coun. v. Bd. of Adjust.,* 644 S.W. 2d 560, 565 (Tex.App.—Austin 1982, writ ref'd n.r.e.). Its substance is determined by what effect it will have on the proceeding if granted. *Austin Neighborhoods Coun.,* 644 S.W.2d at 565. The only order a court can enter if it lacks jurisdiction is one of dismissal. *See Snyder v. Wiley & Porter,* 59 Tex. 448, 449 (1883). The granting of the "special exception" forced the court to dismiss Greenstein Logan's RICO allegations for lack of subject-matter jurisdiction, which was equivalent to the legal effect of a plea to the jurisdiction. Thus, the court could treat the special exception, because of its substance and effect, as a plea to the jurisdiction despite its label. Greenstein Logan was not entitled to amend because it could never replead the RICO allegations in a manner that would confer jurisdiction on the court. *See Joy v. Young,* 194 S.W.2d 159, 160 (Tex.Civ.App. —Austin 1946, no writ). Therefore, the court could not have abused its discretion when it dismissed the RICO allegations without giving Greenstein Logan an opportunity to amend. *See id.* The remaining contention under point four, that the court should have on its own motion stayed or dismissed the suit until the federal court had litigated the RICO allegations, is also rejected. Point four is overruled.

■■■■ Greenstein Logan contends in point five that the court wrongfully excluded evidence of Burgess' personal financial problems and how they related to Burgess Marketing's financial circumstances. It made an informal bill before the court reporter by questioning him about a divorce and alleged personal financial difficulties. The bill was concluded with these comments:

[Defense Attorney]: We would offer Bill of Exception Number 6. Your Honor, I'm so close to where I promised [the court reporter] and I think this is a good place to stop.

The Court: All right, we will adjourn for the day and proceed with this on a different day then.

[Defense Attorney]: Yes, Thank you, sir.

The Court: And I'll see you gentlemen at 9 o'clock in the morning.

Although the bill reflects the substance and offer of Burgess' testimony, it does not contain a ruling by the court excluding it. An informal bill must show that the court excluded the proffered evidence to preserve error for appellate review. *See* Tex. R.App.P. 52(b); *Brown,* 601 S.W.2d at 936. Consequently, the question of whether Burgess' testimony was wrongfully excluded is not reached because it has not been preserved. *See McInnes,* 673 S.W.2d at 187. Point five is overruled.

■■■■ The sixth through fifteenth points are grouped for disposition because they all relate to the refusal of thirty-two requested special issues. Again, the first question to be decided is whether the complaints in these points have been preserved. Rule 276 provides that the trial judge shall, if he refuses a requested issue, "indorse thereon 'Refused,' and sign the same officially." Tex.R.Civ.P. 276. The refused issue, once it is indorsed and signed by the court, constitutes a bill of exception sufficient to have the refusal reviewed on appeal without a formal bill. *Id.* However, if the court fails to sign and indorse his refusal on a requested issue, then the complaining party must use a formal bill to preserve any error. *Newman v. Delhi Gas Pipeline*

*Company,* 517 S.W.2d 635, 636 (Tex.Civ. App.—Tyler 1974, no writ). Otherwise, the complaint that an issue was wrongfully refused cannot be considered. *Id.*

■■■■ Greenstein Logan requested the submission of eleven pages of special issues. Other than a notation on the first of the eleven pages, which noted the time of their filing followed by the court's signature, the requested issues do not reflect, either separately or as a group, that the court ever officially signed and indorsed his refusal on them. Consequently, the requested issues cannot serve as a bill of exception under Rule 276. *See id.*

■■■■ The only other method that Greenstein Logan could have used to preserve any error relating to the refusal of the issues would have been by a formal bill. *See id.* The transcript contains the court reporter's certified transcription of the discussion surrounding some requested special issues. The question is whether the transcription of her notes, which appears separately in the transcript from the eleven pages of requested special issues, can be considered a bill of exception.

Appellate Rule 52(c), which prescribes the requisites of a formal bill, provides in part: "(10) Anything occurring in open court or in chambers that is reported and so certified by the court reporter may be included in the statement of facts rather than in a formal bill of exception." Tex.R. App.P. 52(c)(10). The reporter's transcription cannot be considered a sufficient bill of exception, either formal or informal, because the substance of what was refused is not shown within the transcription. *See Gulf Paving Co.,* 188 S.W.2d at 159.

■■■■ The requirements of Appellate Rule 52, which now govern the preparation of bills of exception, are to ensure that a bill will be accurate and complete. *See McInnes,* 673 S.W.2d at 187. That important purpose would be thwarted if the eleven pages of requested issues, which appear on pages 128 through 138 of the transcript, could be considered a part of the reporter's certified transcription, which appears on pages 166 through 171 of the transcript, or

*vice versa. See id.* To reach such a conclusion one would have to infer or speculate that the eleven pages of requested issues are the same issues the court orally refused in the reporter's transcription. A bill of exception is insufficient to preserve error if it leaves matters to inference or speculation. *See Stephens v. Bowerman,* 27 Tex. 18, 21 (1863). Thus, the complaints in points six through fifteen cannot be considered on appeal because they have not been properly preserved.

However, these points could not be sustained even if the complaints were preserved. The transcription of the reporter's notes reflects that Greenstein Logan requested the issues in the following manner:

> [Defense Attorney]: ... Therefore, we would respectfully request that this Court submit the special issues which are found on pages—either all or part of them—the special issues which are found on pages 1 through 8.
>
> May I have a ruling on those pages, please sir?
>
> The Court: It's refused.
>
> [Defense Attorney]: ... [S]o we would respectfully request this Court, for the reasons stated, to submit our requested special issues which are found on pages 9, 10 and 11 of our Requested Special Issues.
>
> The Court: They are refused.

The issues on the first eight pages were requested and rejected in mass, as were the issues on pages nine through eleven.

▪ A court may refuse a mass request of issues if they are so intermingled as to be confusing or if one or more of them is improper. *Edwards v. Gifford,* 137 Tex. 559, 155 S.W.2d 786, 788 (1941). The failure to submit an issue cannot be a ground for reversal unless the party relying on the issue has requested it in "substantially correct wording." Tex.R.Civ.P. 279. "Substantially correct" means that the issue is worded so as to be "in substance and in the main correct, *and ... not affirmatively incorrect."* *Placencio v. Allied Indus. Intern., Inc.,* 724 S.W.2d 20, 21 (Tex.1987). An issue that assumes contested material facts is affirmatively incor-

rect. *Id.* Likewise, an issue that fails to place the burden of proof and is not accompanied by a requested instruction fixing the burden of proof is not requested in substantially correct wording. *See* Tex.R.Civ. P. 277; *Yellow Cab Company v. Smith,* 381 S.W.2d 197, 198 (Tex.Civ.App.—Waco 1964, writ ref'd n.r.e.).

▪ All of the issues requested by Greenstein Logan failed to fix or refer to the burden of proof, and they were not accompanied by a requested instruction otherwise placing the burden of proof. Consequently, all of the requested issues were affirmatively incorrect. *See id.* Moreover, the issues requested on pages nine and ten were affirmatively incorrect because, not being conditioned, they would have commented on the weight of the evidence. *See Placencio,* 724 S.W.2d at 21.

▪ Finally, the court could have reasonably believed that the first and third issues on page one and the second issue on page four were confusing. The first issue on page one asked whether Burgess Marketing had intentionally interfered with the "auditing process", while the third issue inquired whether such intentional conduct contributed to the "accounting malfunction." However, the second issue on page four asked whether Burgess Marketing's negligent conduct had proximately caused the "malfunction ... of the auditing process." The wording of these two sets of issues indicated that Greenstein Logan was apparently making a definite, but subtle, distinction between the terms "auditing process" and "accounting process". These terms were not defined in the proposed charge, and the evidence in the trial did not clearly define their meanings for the jury. Therefore, the court could have reasonably believed that these issues, regardless of whether the terms were being used in a technical sense, were so intermingled as to be confusing.

Furthermore, the court could have reasonably believed that the first issues on pages nine and ten, which asked whether a material representation was made to Greenstein Logan "concerning the PBC",

were confusing. Various witnesses stated during the trial that the notation "PBC", when found on a document, indicated that the document had been "prepared by [the] client" rather than by the accountant. Therefore, if the court had submitted the two issues as requested, then the jury would have had to substitute the phrase "prepared by client" for the term "PBC" in both issues and also insert the word "document" or "documents" before the phrase "prepared by client" to make the issues clear.

Because one or more of the issues in each mass request were so intermingled as to be confusing or improper, the court did not err when it refused both mass requests. *See Edwards,* 155 S.W.2d at 788. Points six through fifteen are overruled.

The court submitted and the jury answered the first cluster of liability issues as follows:

SPECIAL ISSUE NO. ONE:

Do you find from a preponderance of the evidence that in performing the fiscal years 1984 and 1985 audits that Greenstein, Logan & Company failed to perform the audits in accordance with Generally Accepted Auditing Standards?

ANSWER: "Yes" or "No"

ANSWER: Yes

If you have answered special issue No. 1 "Yes", then answer special issue Nos. 2 and 3; otherwise do not answer special issue Nos. 2 and 3.

SPECIAL ISSUE NO. TWO:

Do you find from a preponderance of the evidence that such failure, if any, was a proximate cause of some damages to Burgess Marketing, Inc.?

Answer: "Yes" or "No"

ANSWER: Yes

SPECIAL ISSUE NO. THREE:

Do you find from a preponderance of the evidence that such failure, if any, was negligence?

Answer: "Yes" or "No"

ANSWER: Yes

Greenstein Logan objected to Special Issue No. Two, the proximate-cause issue, because it was conditioned on the conduct issue (Special Issue No. One) rather than on the negligence issue (Special Issue No. Three). A similar objection was made to Special Issue No. Five, the proximate-cause issue in the second set of liability issues, which was also conditioned on the conduct issue in that series rather than on the negligence issue. The jury also answered the second cluster of liability issues in Burgess Marketing's favor.

Greenstein Logan contends in points sixteen and seventeen that the court erred when it overruled the objections to the two proximate-cause issues. It argues that it was harmed by the proximate-cause issues being conditioned on the conduct issues rather than on the negligence issues because the court entered a judgment in Burgess Marketing's favor even though no causal connection had ever been made between its negligence and Burgess Marketing's damage.

 The plaintiff must establish a causal connection between his damages and the defendant's negligent conduct before he can recover. *See Commonwealth of Massachusetts v. Davis,* 140 Tex. 398, 168 S.W.2d 216, 222 (1942). However, reversible error will result from the improper submission of issues only if the complaining party has been harmed. *Boatland of Houston, Inc. v. Bailey,* 609 S.W.2d 743, 749–50 (Tex.1980). The entire charge must be considered in determining whether harm has resulted from an improper submission. *Id.* at 750. An error resulting from the improper submission of an issue may be rendered harmless by findings on other issues. *See id.; Braugh v. Phillips,* 557 S.W.2d 155, 157–58 (Tex.Civ.App.—Corpus Christi 1977, writ ref'd n.r.e.).

 Burgess Marketing established by jury findings that: (1) the act or omission occurred (Special Issue No. One and Special Issue No. Four); (2) the act or omission was negligence (Special Issue No. Three and Special Issue No. Six); and (3) the act or omission was the proximate cause of "some" damage (Special Issue No. Two and

Special Issue No. Five). These findings necessarily established, regardless of their sequence, the causal connection between Greenstein Logan's negligent act or omission and Burgess Marketing's damages. Assuming that error resulted from the proximate-cause issues being conditioned on the conduct issues rather than on the negligence issues, the answers to the negligence issues rendered that error harmless. *See Braugh*, 557 S.W.2d at 157–58.

█ Greenstein Logan made a second objection to the proximate-cause issues:

2. The Defendants further [object] and [except] ... because [Special Issue No. Two and Special Issue No. Five] says that "a proximate cause of *some* damages to Burgess Marketing, Inc.?" The law is that the Plaintiff is entitled to recover for the damages that are proximately caused by the conduct of the Defendants, not to have injected in there the word "some" of the damages.

Essentially, it objected to the word "some" being included in the proximate-cause issues without providing the court an adequate explanation of how and why it would be harmed by the submission. Rule 274 requires the party objecting to the charge to "point out distinctly the matter to which he objects and the grounds of his objection." Tex.R.Civ.P. 274. Otherwise, the complaint is waived. *Id.* The second objection was too vague and general to preserve error.

█ However, if the second complaint had been preserved by a proper objection, then points sixteen and seventeen still could not be sustained. Apparently, Greenstein Logan complains that the word "some" allowed the jury to find proximate cause without having to consider the quantum of the damage proximately caused by its negligence. Special Issue No. Seven, the damage issue, asked the jury to find the amount of damages "proximately caused" by Greenstein Logan's negligent conduct. This was sufficient to restrict the jury to awarding only those damages proximately caused by negligent conduct. *See Tyler Mirror & Glass Company v. Simpkins*, 407 S.W.2d 807, 816 (Tex.Civ.App.—

Tyler 1966, writ ref'd n.r.e.). The sixteenth and seventeenth points are overruled.

█ Greenstein Logan contends in point eighteen that the court abused its discretion when it allowed Burgess Marketing to file a trial amendment pleading the elements of common-law fraud after the evidence was closed and just prior to the jury argument. Rule 66 grants the court broad discretion in allowing or denying trial amendments. *See* Tex.R.Civ.P. 66; *Yowell v. Piper Aircraft Corp.*, 703 S.W.2d 630, 634 (Tex.1986). Furthermore, the complaining party must file a motion for a continuance, pleading surprise or prejudice arising from a trial amendment, and have it denied before he can complain about the granting of a trial amendment. *See Rocha v. Ahmad*, 676 S.W.2d 149, 154–55 (Tex. App.—San Antonio 1984, writ dism'd).

█ The complaint in point eighteen has not been preserved because Greenstein Logan never asked the court for a continuance based on the trial amendment. *Id.* However, the point could not be sustained even if it were properly preserved. An appellate court cannot reverse a judgment for an error of law unless the error was reasonably calculated to cause and probably did cause the rendition of an improper judgment. Tex.R.App.P. 81(b)(1). The judgment, which is based on findings of negligence and proximate cause, does not depend on findings of common-law fraud, the cause of action plead in the trial amendment. Therefore, Greenstein Logan could not have been harmed by the trial amendment which plead a cause of action on which the jury never made any findings and on which the judgment does not depend for its support. Therefore, assuming that the court abused its discretion when it granted the trial amendment, that error was harmless because it could not have contributed to the entry of an improper judgment. *See id.* Point eighteen is overruled.

Greenstein Logan complains in the remaining seven points of error about the denial of its motion to vacate the judgment and for a judgment notwithstanding the verdict. Generally, it uses these points to

attack the legal and factual sufficiency of the evidence supporting the findings on the two clusters of liability issues and on the damage issue. However, Greenstein Logan does not contest the finding in Special Issue No. One that it failed to perform the 1984 and 1985 audits in accordance with generally accepted auditing standards. Legal sufficiency will be determined by considering only the evidence and inferences tending to support the finding and disregarding all evidence and inferences to the contrary. *See McGalliard v. Kuhlmann,* 722 S.W.2d 694, 696–97 (Tex.1986). However, all of the evidence will be considered and weighed to determine factual sufficiency. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986).

■■■ The question under point twenty-four is whether the evidence was legally and factually sufficient to support the findings in Special Issue No. Two and Special Issue No. Three that Greenstein Logan's failure to comply with the generally accepted auditing standards was negligence and a proximate cause of Burgess Marketing's damage. Certified public accountants are liable for the damages proximately caused by their negligence just like other skilled professions. *See Atkins v. Crosland,* 406 S.W.2d 263, 264 (Tex.Civ.App.—Fort Worth 1966), *rev'd on other grounds,* 417 S.W.2d 150 (Tex.1967). Accordingly, they owe their clients a duty to exercise the degree of care, skill and competence that reasonably competent members of their profession would exercise under similar circumstances. *See Franklin Supply Company v. Tolman,* 454 F.2d 1059, 1065 (9th Cir. 1972); *Matter of Hawaii Corp.,* 567 F.Supp. 609, 617 (D.C.Hawaii 1983). Expert testimony is usually necessary to establish the requisite standard of care and skill, a departure from that standard, and the causal link between the plaintiff's damages and the accountant's negligence.

*Kemmerlin v. Wingate,* 274 S.C. 62, 261 S.E.2d 50, 51 (1979). An accountant usually discharges the duty owed to his client by complying with recognized industry standards, such as the "Generally Accepted Auditing Standards," when performing an audit.[2] *See Securities and Ex. Comm. v. Arthur Young & Co.,* 590 F.2d 785, 788 (9th Cir.1979).

■■■ Several experts in the accounting profession established the standard of care and skill required of reasonably competent certified public accountants in performing audits. They explained the requirements of the generally accepted auditing standards, the professional standards that governed Greenstein Logan's performance of the audits. Stanley Scott, a professor of accounting at Southern Methodist University, reviewed Burgess Marketing's ledgers, journals and financial statements, as well as Greenstein Logan's audit work papers, for fiscal years 1983 through 1985, and explained to the jury in detail how Greenstein Logan had departed from the generally accepted auditing standards during the 1984 and 1985 audits. He described their work on the two audits as such a "flagrant, violent violation of the generally accepted auditing standards" that he felt compelled to testify against them. Dr. Bill Thomas, the head of Baylor University's accounting department, agreed that Greenstein Logan had not complied with the generally accepted auditing standards while performing the two audits. Dr. Thomas was Greenstein Logan's own accounting expert. Scott and Thomas both said that the tax delinquency would have been easily discovered during the audits if Greenstein Logan had only adhered to the generally accepted auditing standards. The evidence from these experts was both legally and factually sufficient to support the finding in Special Issue No. Three that the failure to perform the

---

**2.** "Auditing" is the process whereby the independent certified public accountant conducts an examination of management's financial statements to determine whether the statements present fairly the financial information which they purport to convey. "Generally Accepted Auditing Standards" are general standards of

conduct relating to the auditor's professional qualities as well as to the judgments exercised by him in the performance of his examination and the issuance of his report. AICPA, Professional Standards, Statements on Auditing Standards No. 1, § 150.01. *Securities and Ex. Comm.,* 590 F.2d at 788 n. 2.

audits in accordance with generally accepted auditing standards was negligence.

Greenstein Logan also questions under point twenty-four whether the finding in Special Issue No. Two, that its failure to perform the audits in accordance with generally accepted auditing standards was a proximate cause of Burgess Marketing's damage, was supported by legally or factually sufficient evidence. Proximate cause includes two elements: (1) cause in fact and (2) foreseeability. *Williams v. Steves Industries, Inc.,* 699 S.W.2d 570, 575 (Tex.1985). Negligent conduct is a cause in fact of harm if it is a substantial factor in bringing it about. *Texas & Pacific Railway Company v. McCleery,* 418 S.W.2d. 494, 497 (Tex.1967). A certified public accountant should reasonably foresee that his failure to detect material errors or falsifications in a client's books during an audit will likely result in continued errors and falsifications. *Lincoln Grain, Inc. v. Coopers & Lybrand,* 345 N.W.2d 300, 308–09 (Neb.1984). Likewise, he must also reasonably foresee that his client will rely on the accuracy of audited financial statements. *See Haddon View Inv. Co. v. Coopers & Lybrand,* 436 N.E.2d 212, 215 (Ohio 1982).

Testimony by Professor Scott, Steve Bostick and Jack Burgess provided legally and factually sufficient evidence from which the jury could have reasonably found that Burgess Marketing's damages were proximately caused by Greenstein Logan's negligent failure to perform the 1984 and 1985 audits in accordance with generally accepted auditing standards. According to Bostick, the audit manager for Patillo Brown, Burgess Marketing's unpaid federal excise-tax liability on March 31, 1984, was $287,229 instead of $21,900 as shown on the 1984 audited financial statements prepared by Greenstein Logan. Furthermore, he said the company actually owed $1,177,358 in unpaid federal excise taxes on March 31, 1985, rather than $137,473 as shown on the 1985 audited financial statements. By the time Burgess Marketing discovered the underpayment in September 1985, Bostick said, the company's excise-

tax liability had risen to $1,650,000. Burgess testified that at the time of the trial the company's total liability for federal excise taxes, including interest and penalties, was approximately $2,700,000, the amount of the federal tax lien. Burgess was paying the Internal Revenue Service $18,000 in interest each month on the delinquent tax to prevent Burgess Marketing's liquidation through involuntary bankruptcy.

Burgess Marketing immediately resumed paying the correct federal excise tax each month as soon as the underpayment was discovered, and Burgess immediately increased prices on non-gasoline items sold at the company's convenience stores and imposed stringent cost controls. These management decisions resulted in the company's operations again becoming profitable within six months. Scott and Bostick both shared the professional opinion that, if Greenstein Logan had discovered the underpayment during the 1984 audit when the company's liability was only $287,229, Burgess could have then made the same management decisions which he later made. They said this would have enabled Burgess Marketing to discharge the $287,229 tax liability, plus penalties and interest, out of its operating profits without jeopardizing the company's existence. Bostick, Burgess and Bill Nesbitt, who was Burgess Marketing's banker, all testified that the company was effectively bankrupt at the time of the trial, although it was operating at a profit, because it could not discharge the $2,700,000 tax lien out of operating profits within a period of time acceptable to the Internal Revenue Service.

The jury could have reasonably concluded from this evidence that the negligent failure of Greenstein Logan to perform the 1984 and 1985 audits in accordance with generally accepted auditing standards was a substantial factor in bringing about Burgess Marketing's bankruptcy, and that the damage would not have occurred but for such negligence. Furthermore, the jury could have reasonably concluded from this evidence that Greenstein Logan could or should have reasonably foreseen that Burgess Marketing and Jack Burgess would

rely to their detriment on the inaccurate 1984 and 1985 audited financial statements. Therefore, the evidence was both legally and factually sufficient to support the finding in Special Issue No. Two that Greenstein Logan's failure to perform the audits in accordance with generally accepted auditing standards was a proximate cause of Burgess Marketing's damages. Point twenty-four is overruled.

 The jury found in Special Issue No. Seven that Greenstein Logan's negligent conduct had proximately caused Burgess Marketing to suffer $3,500,000 in damages. Greenstein Logan attacks the legal and factual sufficiency of the evidence supporting this finding in point nineteen, and alleges in point twenty-five that the damage award was excessive and the product of the jury's confusion. Evidence is factually sufficient to support a damage award if the jury can ascertain from it the amount of damages with reasonable certainty. *See White v. Southwestern Bell Tel. Co., Inc.,* 651 S.W.2d 260, 262 (Tex. 1983). If the injured party produces the best evidence available of his damages and if such evidence provides a reasonable basis for determining his loss, then he is entitled to a recovery although the exact amount of the damages cannot be ascertained. *Vance v. My Apartment Steak House, Etc.,* 677 S.W.2d 480, 484 (Tex. 1984). When measured against these rules, the evidence was both legally and factually sufficient to support the damage award of $3,500,000.

 Dr. Franklin Potts, a professor of corporate finance at Baylor University, was hired by Burgess Marketing to calculate the damages proximately caused by Greenstein Logan's negligent conduct. He reviewed the company's financial data from 1969 to 1983 to determine how it had been operated and then acquainted himself with what had happened to the company since 1983. The data and information included, among other things, financial statements, sources and uses of funds, cash-flow projections, information about the company's loans, plans for expansion, and other related matters. Potts then used three differ-

ent methods to calculate Burgess Marketing's damages for the jury. He said all three methods were generally recognized and accepted in the field of corporate finance for determining the amount of loss suffered by a business.

The third method that Potts used is known as the "discounted cash flow" approach or "capitalization of income" approach. He described this approach as the "most accurate" and "most generally accepted by financial experts" for calculating damage to a business. It rests on the premise that the value of a company is based on the "stream of income" it can reasonably be expected to produce in the future, i.e., its future cash flow discounted back to its present value and then "capitalized." Potts described his calculations for the jury in detail under this approach. He used a "standard deviation or mean variance approach" to reach a "95% confidence interval" that Burgess Marketing would have earned at least $430,268 a year in net income based on its normal business operations "as of 1987." He then discounted that future annual net cash flow back to its value at the time of the trial and "capitalized" it as the company's value. He estimated that Burgess Marketing would have had a value of $3,585,567 to an investor at the time of the trial, assuming that Burgess would not have made the erroneous business decisions he actually made using the inaccurate financial statements prepared by Dunham and Greenstein Logan. However, Potts said the company actually had a "zero" market value to an investor at the time of the trial because of its bankrupt condition. Therefore, he concluded that the company had been damaged $3,585,567 as a proximate result of its reliance on the inaccurate financial statements to make business decisions.

When asked to choose from among the three approaches, Potts stated that Burgess Marketing had suffered "three and a half million dollars" in damages at the time of the trial, the amount calculated under the third method. The jury obviously accepted his estimate because it answered Special Issue No. Seven with exactly the

same figure. Combining the expert testimony of Dr. Potts with that of Jack Burgess, who testified in detail about the business decisions he actually made based on inaccurate financial statements and those he would have made if he had been given accurate financial statements, produced evidence that was legally and factually sufficient to support the jury's answer of $3,500,000 to the damage issue. Likewise, the award was not excessive because it was well below the total amount of damage estimated by Potts under the third approach. The complaint that the damage award was a product of the jury's confusion is also rejected. Point nineteen is overruled to the extent that it attacks the sufficiency of the evidence supporting the damage issue. Point twenty-five is also overruled.

Greenstein Logan also contends under point nineteen that the evidence was legally and factually insufficient to support the findings on the second cluster of liability issues, Special Issue No. Four through Special Issue No. Six. The jury found in these issues that Gary Bonds, one of Greenstein Logan's partners, had negligently misrepresented Norman Dunham's competence as an accountant before Burgess Marketing hired him as its comptroller, and that Burgess Marketing's damages were proximately caused by that negligent misrepresentation.

■■■ A certified public accountant is liable for negligent misrepresentations made while performing his services. *Matter of Hawaii Corp.*, 567 F.Supp. at 617. Section 552 of the Second Restatement of Torts sets the standard for liability:

§ 552 Information Negligently Supplied for the Guidance of Others

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

Restatement (Second) of Torts § 552(1) (1977); *Matter of Hawaii Corp.*, 567 F.Supp. at 617.

■■■ Burgess testified that he regularly sought and paid for Greenstein Logan's professional advice on matters relating to Burgess Marketing's accounting problems and procedures, hiring of accounting personnel, and taxes. He claimed that he talked to several partners at Greenstein Logan, including Gary Bonds, in mid–1982 about replacing Burgess Marketing's bookkeeper, and that Bonds recommended he hire Dunham. Burgess said that he hired Dunham because Bonds had represented him to be a "competent accountant, a competent CPA", with experience in audit and tax. Bonds admitted talking to Burgess "in general terms" about Burgess Marketing hiring a certified public accountant as its comptroller, but denied ever recommending Dunham for the position. Burgess' testimony, standing alone, was legally and factually sufficient evidence from which the jury could have reasonably concluded that Bonds had, prior to Dunham's employment, represented to Burgess that Dunham was a competent and skilled accountant who could perform the duties of comptroller. Likewise, the evidence was also legally and factually sufficient for the jury to have found that Bonds had made this representation during the regular performance of Greenstein Logan's services.

However, expert testimony during the trial cast serious doubts on Dunham's competency as an accountant and comptroller. Steve Bostick, who headed the review of the company's excise-tax accounts for Patillo Brown, found that Burgess Marketing's accounting records were so filled with errors, unexplained journal entries, entries made without any apparent business purpose, and lacked such documentary support that they were virtually unauditable. Judging by the company's records, Bostick concluded that Dunham obviously had a "very difficult time keeping up with the operations of the company" and did not seem to know what he was doing. Specifi-

cally, with respect to the excise-tax accounts, Bostick found that Dunham had, among other errors, erroneously calculated the excise tax based on gallons purchased rather than on gallons sold, filed inaccurate quarterly excise-tax returns, and failed to file quarterly tax returns or pay the excise tax for several quarters. This evidence was both legally and factually sufficient for the jury to have reasonably concluded in Special Issue No. Four that Dunham's services as an accountant did not have the characteristics that Bonds had represented them to have.

The jury found in Special Issue No. Six that Bonds was negligent when he made the misrepresentation. Norman Dunham had been responsible for Farmers Supply Corporation's accounting matters while he was employed at Greenstein Logan. Bradley Holmes, the comptroller for Farmers Supply, said he told Gary Bonds as early as June or July 1982 that he had discovered an unexplained account and confusing or unexplained journal entries in the company's books which had raised serious questions about Dunham's accounting work. Bonds was the "partner in charge" of Farmers Supply's audits, and Dunham was responsible for the audit work on Farmers Supply in the field. Holmes discovered that Dunham, acting on his own, had created a "fictitious" account, made the unexplained journal entries and even "plugged" figures in Farmers Supply's books. Just as would later happen with Burgess Marketing, Greenstein Logan's annual audits had failed to detect the errors. The ultimate result of Dunham's errors, when the books were finally adjusted, was that Greenstein Logan's audited financial statements had overstated Farmers Supply's assets, understated its liabilities, and overstated its income by $600,000. Holmes said that Farmers Supply was, unknown to its owner, actually bankrupt and later had to be liquidated.

The jury could have reasonably concluded, based on Holmes' testimony, that Gary Bonds either knew or should have known that there was a serious question about Dunham's skill and competence as an accountant before he represented to Burgess

that he was "a competent accountant, a competent CPA" and that Bonds had negligently misrepresented Dunham's skill and competence. Accordingly, the evidence was both legally and factually sufficient to support the finding in Special Issue No. Six that the misrepresentation of Dunham's competence was negligently made.

■ Jack Burgess testified that he would not have hired Dunham as Burgess Marketing's comptroller except for Bonds' recommendation and representation of his skill and competence as an accountant. If Dunham had performed his job competently, correctly calculated and timely paid the company's federal excise taxes, then Burgess Marketing would not have become bankrupt because of its delinquent tax payments. The jury could have reasonably concluded from the evidence that Bonds' negligent misrepresentation of Dunham's skill and competence was a substantial factor in bringing about Burgess Marketing's damages. Furthermore, the jury could have believed from the evidence that Greenstein Logan should have reasonably foreseen that a negligent misrepresentation of Dunham's competence as an accountant and comptroller could or would cause Burgess Marketing serious financial damage. Therefore, the evidence was legally and factually sufficient to support the finding in Special Issue No. Five that Bonds' negligent misrepresentation of Dunham's competence was a proximate cause of the company's damage. Point nineteen, which also questions the sufficiency of the evidence supporting the findings on the second cluster of liability issues, is overruled in its entirety.

Thus, Burgess Marketing's judgment is supported by jury findings based on factually sufficient evidence on two independent causes of action based on negligence. Points twenty and twenty-three, in which Greenstein Logan asserts that the judgment cannot be supported on any theory of recovery based on findings in Special Issue No. Four through Special Issue No. Six, are overruled.

■ Greenstein Logan attempts in points twenty-one and twenty-two to interpose Burgess' and Dunham's alleged negligent, intentional or fraudulent conduct as a complete bar to or in mitigation of any recovery by Burgess Marketing. Apparently, the circumstances under which an accountant can use the client's negligence, fraud or intentional conduct to avoid or absolve himself from liability for malpractice has not yet been decided in Texas. However, the question has been decided in other jurisdictions. *See Lincoln Grain, Inc.,* 345 N.W.2d at 306–09; *Cenco Inc. v. Seidman & Seidman,* 686 F.2d 449, 456 (7th Cir.1982). Although recognizing a divergence of authority, the decision in *Lincoln Grain, Inc.* establishes the preferable and more prudent rule of when an accountant can use the client's contributory negligence as a shield:

> We agree with the view ... that accountants are not be rendered immune from the consequences of their own negligence merely because those who employ them may have conducted their own business negligently. Allowing such a defense would render illusory the notion that an accountant is liable for the negligent performance of his duties. We hereby adopt the rule ... that *the contributory negligence of the client is a defense only where it has contributed to the accountant's failure to perform the contract and to report the truth.* The evidence here is such that whether Lincoln Grain was contributorily negligent in its dealings with the auditors and whether such negligence contributed to Coopers & Lybrand's failure to perform its contract in accordance with generally accepted auditing standards are questions *of fact for the jury under an instruction in accordance with the foregoing rule.*

*Lincoln Grain, Inc.,* 345 N.W.2d at 307 (emphasis added).

This rule, which is applied here, recognizes the duty of the accountant to comply with generally accepted auditing standards and, at the same time, recognizes the client's duty to not negligently interfere with the audit. Thus, Greenstein Logan had to establish, either as a matter of law or by appropriate jury findings, that Burgess, Dunham or the company was negligent *and* that their negligence had proximately contributed to its failure to perform the 1984 and 1985 audits in accordance with generally accepted auditing standards. *See id.* The evidence did not conclusively establish either requirement, and the requirements were not established by jury findings.

■ Dunham admitted that he intentionally underpaid the excise tax and then lied to Greenstein Logan during the audits about the status of the excise-tax accounts. Greenstein Logan contends that Dunham's testimony conclusively established fraud on his part which was attributable to Burgess Marketing. Relying on the decision in *Cenco Inc.,* it then argues that Burgess Marketing's own fraud bars any recovery in the suit. The problem with this contention, as with its assertion of contributory negligence, is that it was not conclusively established in the evidence or by jury findings.

The court in *Cenco Inc.* rejected, as does this court, the "extreme" view that an employee's fraud is always attributable to the corporation. *Cenco Inc.,* 686 F.2d at 454. Such a rigid view would, if adopted, completely exonerate an auditor from negligently failing to detect or prevent fraud by corporate employees during an audit. *See id.* The following excerpt from the *Cenco Inc.* opinion properly delineates the limited circumstances under which an auditor can rely on the fraud of his client to bar recovery:

> Fraud on behalf of a corporation is not the same thing as fraud against it. Fraud against the corporation usually hurts just the corporation; the stockholders are the principal if not only victims; their equities vis-a-vis a careless or reckless auditor are therefore strong. But the stockholders of a corporation whose officers commit fraud for the benefit of the corporation are beneficiaries of the fraud ... But the primary costs of a fraud on the corporation's behalf are borne not by the stockholders but by

outsiders to the corporation, and the stockholders should not be allowed to escape all responsibility for such a fraud, as they are trying to do in this case. *Id.* at 456.

The holding in *Cenco Inc.* barred any recovery by the corporation against its auditors for negligently failing to detect fraud during an audit because the corporation's top-level management had actually perpetrated the fraud *on behalf of rather than against the company.* Under such circumstances, the court held that the stockholders of the corporation should not be allowed to shift the entire responsibility for the fraud to its auditors and profit from the corporation's own fraud. *Id.* This rule will also be applied here because it requires the accountant to discharge his duty under the generally accepted auditing standards to detect fraud during an audit, but prevents a corporation from recovering for a negligently performed audit if its top management perpetrates the undetected fraud in behalf of the company.

Therefore, assuming that Dunham's intentional acts constituted fraud on his part, Greenstein Logan could not automatically attribute his fraud to Burgess Marketing. *See id.* at 454. It could do so only by establishing, either as a matter of law or by favorable findings on disputed facts, that Dunham had perpetrated the fraud on behalf of Burgess Marketing or that Burgess had either participated in the fraud or condoned it. *See id.* at 456.

■ The evidence raised fact issues on what motivated Dunham to intentionally do what he did and whether he did it to benefit himself or the company. The evidence tended to show that Burgess Marketing was grievously harmed by Dunham's fraud, if any was committed, rather than benefited by it. Furthermore, the evidence was inconclusive whether Burgess even knew about the tax delinquency prior to September 1985. Having failed to resolve these fact issues in its favor by appropriate jury findings or conclusive proof, Greenstein Logan's contentions of contributory negligence and fraud were waived. *See*

Tex.R.Civ.P. 279. Accordingly, points twenty-one and twenty-two are overruled.

The judgment is affirmed.