786 So.2d 323 (2001)
The ORTHOPAEDIC CLINIC OF MONROE (A Medical Corporation), Myron Bailey, M.D., Rifat Nawas, M.D., Frank Cline, M.D., and Frank X. Cline, M.D., (A Professional Medical Corp.), Plaintiffs-Appellees,
v.
RUHL, Esq. and XYZ Insurance Company, Defendant-Appellant.
No. 34,700-CA.
Court of Appeal of Louisiana, Second Circuit.
May 11, 2001.
*326 Snellings, Breard, Sartor, Inabnett & Trascher, by Charles C. Trascher, III, Monroe, La., Shawn D. Akers, Counsel for Appellant.
Watson, Wyatt & Company, by Paul A. Myer, Of Counsel for Appellant.
Kuehne & Foote, by G. Bruce Kuehne, Counsel for Appellees.
Before BROWN, PEATROSS and KOSTELKA, JJ.
KOSTELKA, Judge.
In this actuarial malpractice suit, Watson, Wyatt & Company ("Wyatt") appeals the trial court judgment which denied its prescription exception and found Wyatt to have fallen below the standard of care in giving consulting advice regarding a defined benefit plan owned by Drs. Myron Bailey, Frank Cline and Rifat Nawas ("Plaintiffs"). Finding no manifest error in the trial court's judgment, we affirm.

FACTS
In 1984, following a joint marketing effort by Central Bank of Monroe ("Central Bank") and Wyatt, The Orthopedic Clinic of Monroe ("Clinic"), owned and operated by plaintiffs, availed itself of the advantages of a type of retirement plan called a Defined Benefit Plan ("DBP"). Four separate plans were establishedone each for the three physicians and one for the non-physician employees. A DBP is funded annually by the employer in an amount needed to generate a fixed amount per month (defined benefit) to the beneficiaries upon retirement based on applicable interest rates. Contributions made into a DBP may vary from year to year depending upon the plan's performance, number of employees and their salaries, and the amounts of contributions made in prior years.
Wyatt performed actuarial work for Central Bank's retirement plans and would frequently be introduced to Central Bank's clients. It was as a result of this relationship that Central Bank and Wyatt recommended the Clinic set up a DBP for which Wyatt would perform legally-required actuarial services as the "enrolled actuary." Wyatt filed tax forms for the DBP which certified the funding levels were within Internal Revenue Service ("IRS") guidelines and that contributions were timely made and performed actuarial evaluations which included monitoring the funding, costs and benefits of the plan. Central Bank functioned as the plan trustee and monitored funds and furnished annual reports to plaintiffs and Wyatt.
The four plans operated without consequence until Congress passed the Tax Reform Act of 1986 ("TRA86"). In pertinent part, TRA86 provided that a DBP could no longer discriminate between highly and less highly compensated employees by *327 maintaining separate plans. Practically, TRA86 mandated either termination or merger of the Clinic's plans by 1989.
In January of 1987, the Clinic secured the services of Dan Ruhl ("Ruhl"), an attorney with a Master's Degree in taxation, as a "Clinic Benefit Consultant," plan advisor, or plan record keeper. Ruhl was asked to "take an independent look at the plans," from a cost standpoint.
At a June 19, 1988 business meeting, the Clinic agreed to terminate Drs. Nawas' and Bailey's plans as of June 30, 1988 and Dr. Cline's as of June 30, 1989. Nevertheless, the termination deadline passed and the plans were automatically merged. It was not until the end of 1990, one and one-half years after the June 30, 1989 TRA86 deadline, that the Clinic executed a merger amendment to the plans which was retroactive to June 30, 1989. The merger of the plans caused all assets to be available to pay all benefits.
In December, 1990, the Clinic terminated Ruhl's employment and transferred his job responsibilities as "record keep[er]" and "report-giv[er]" to Central Bank.
When in late 1991 and early 1992 the IRS conducted an audit of the Clinic's plans, the Clinic reinstated Ruhl's services to assist with the audit. Because Drs. Nawas and Bailey were participating in both the DBP and another type of contribution plan, each had accrued benefits in excess of the IRS maximum. As a result, the IRS required the amounts paid into one of the plans to be returned to the Clinic which resulted in the imposition of approximately $17,000 in excise taxes.
It was in January, 1993 that Wyatt recommended termination of the DBP. Shortly thereafter, Wyatt inexplicably forwarded resolutions to the Clinic's board of directors which ceased employee benefit accruals effective January 31, 1993 and plaintiffs' benefit accruals effective June 30, 1989. On May 20, 1993, Wyatt forwarded estimated lump-sum benefit amounts to be paid upon termination of the retirement plan which did not include actuarial calculations of plan assets and liabilities. Via a phone inquiry by the Clinic office administrator, Wyatt provided calculations which reflected an overall asset overage of $12,200, but an approximate $110,000 shortfall in the employee account. (Employee assets $80,441.27, liabilities $189,885.65). Notably, it was not until 1994 that the Clinic discovered that the liability calculations were undervalued due to Wyatt's use of incorrect interest rates.
In a letter dated July 23, 1993, Ruhl informed Wyatt that plaintiffs had decided, at a meeting where Wyatt was unrepresented, to waive benefits in excess of the available assetsto cover any potential employee benefit shortfalland to maintain the plan until plaintiffs had completed ten years of participation on June 30, 1994.
On March 15, 1994, Wyatt sent Ruhl a letter once again estimating the lump-sum benefits which would be payable upon termination of the plan. Therein, Wyatt for the first time explained that the termination lump-sum benefits were required to be calculated using an interest rate no greater than the rates established by the governmental agency known as the Pension Benefit Guarantee Corporation ("PBGC"). At the time of the letter, the PBGC rates had dropped to 4.5% (the plan rate was 7%).[1] Wyatt explained that the decline in PBGC rates meant that "the *328 lump sum benefits payable under the Orthopaedic Clinic plan have increased dramatically." Indeed, at that time, the calculations reflected an overall plan shortfall of approximately $658,300.
The plan termination process began in 1994 but was not completed until mid-tolate 1996 due to Wyatt's delay in responding to IRS requests for information.
The Clinic and plaintiffs instituted suit against Ruhl on November 23, 1994 and amended the petition to add Wyatt and Central Bank (collectively "Defendants") on December 16, 1994.[2] The pleadings alleged that the defendants "failed to adequately explain ... the economic consequences of the adoption by default of a single plan and the alternatives which were available ...." by failing to properly advise the Clinic to terminate the plans prior to 1987 and July 1, 1989, regarding the freezing of accruals, termination of the plan and the failure to avoid the IRS audit and ultimate payment of excise taxes.[3]
On August 14, 1998, Wyatt filed a Motion for Summary Judgment which in part argued that plaintiffs' claims had prescribed. The trial court referred the issue of prescription to the merits of the case. After the issue was again reurged at trial, the court denied the prescription claim finding that the actual loss occurred when the plan was terminated in 1994 because Wyatt had failed to advise plaintiffs of the mandatory application of the PBGC rates until that year. The court also found Wyatt solely negligent in failing to properly advise plaintiffs regarding the funding, monitoring and termination of the plan, awarded them $589,920 in damages and dismissed the claims of the Clinic and the claims of all parties against Ruhl. This appeal ensued.

DISCUSSION

Prescription
Delictual actions, such as professional malpractice, are subject to a liberative prescription of one year in the absence of more specific legislation. La.C.C. art. 3492; Harvey v. Dixie Graphics, Inc., 593 So.2d 351 (La.1992). Prescription of a delictual action begins to run from the date the injury or damage is sustained. Id. The damage suffered must be actual and appreciable in qualitythat is, determinable and not merely speculative. Harvey, supra. Courts should resolve doubts about a prescription question in favor of giving the litigant his day in court. Hunter v. Tensas Nursing Home, 32-217 (La.App.2d Cir.10/27/99), 743 So.2d 839, writ denied, 99-3334 (La.02/04/00), 754 So.2d 228.
Plaintiffs claim that Wyatt's continued acts of negligent advisement regarding the DBP which extended from 1987-1994 caused them substantial economic loss.
Because of the dates involved, the resolution of this difficult prescription issue hinges upon a determination of whether each alleged negligent incident constitutes a separate cause of action, with prescription running from the date of each separate incident; or, a continuous course of action which constitutes a single cause of action, with prescription running from the date of last incident or abatement of the course of conduct. Bustamento v. Tucker, 607 So.2d 532 (La.1992).
An exception to the general prescription rule is that when damaging conduct is of a continuous nature, prescription *329 does not begin to run until the date of the last harmful act. South Central Bell Telephone Co. v. Texaco, Inc., 418 So.2d 531 (La.1982); Hunter, supra. This type of claim is called continuing tort. Continuing tort includes both continuing acts of fault and continuing damage. Hunter, supra.
It has been suggested that prescription is delayed until the continuing tort ceases when a complex business tort, similar to a continuing tort, is involved. State ex rel. Ieyoub v. Bordens, Inc., 95-2655 (La.App. 4th Cir. 11/27/96), 684 So.2d 1024, writ denied, 97-0339 (La. 03/14/97), 690 So.2d 42; National Council on Compensation Insurance v. Quixx Temporary Services, Inc., 95-0725 (La.App. 4th Cir. 11/16/95), 665 So.2d 120. Considering the character of the parties' relationship, as well as the type of transaction involved, we find this reasoning persuasive in resolving the present matter.
As is obvious from the record, the relationship between Wyatt and plaintiffs concerned a complicated business transaction regarding the economic performance of specific retirement plans. It is undisputed that Wyatt's duties included at the very least the responsibility of providing plaintiffs with periodic actuarial calculations regarding plan performance. The contingencies attendant to the DBP made the accuracy of and consistency in providing that information a crucial factor in plaintiffs' decisions to terminate or continue the plan and thereby affected the continuing and ultimate economic benefit or loss received by plaintiffs. Indeed, because of the type of transaction, each decision regarding continuation or termination of the plan affected both the ongoing performance of the plan as well as its ultimate outcome. In this sense, bad or uninformed decisions could potentially cause a continual decline in benefits until plan termination. Accordingly, the very nature of the transaction resulted in a synergism between the alleged negligent advice and resulting damage which, in our view, cannot justly be classified as separate acts of negligence which would produce distinct and particular damage. We conclude, therefore, that if proven, the series of negligent acts by Wyatt would have continued to compound plaintiffs' damage. The continuous negligent acts by the same party, coupled with the cumulative nature of the damages, makes this case analogous to, if not classified as, a continuing tort for which prescription did not begin to run, at the very least, until Wyatt's incorrect use of PBGC rates was revealed to plaintiffs in March of 1994.[4] We, accordingly, find no error in the trial court's conclusion that plaintiffs' claims have not prescribed.

Liability
In a negligence action, there are traditionally five elements that a plaintiff must establish to prove a claim: 1) cause in fact; 2) duty; 3) breach of duty; 4) legal or proximate cause; and 5) actual damages.
On appeal, Wyatt initially urges that plaintiffs failed to prove Wyatt's acts were the cause in fact of plaintiffs' losses.
Cause in fact is a "but for" analysis; if the plaintiff would not have sustained his injuries "but for" the defendant's substandard conduct, then such conduct is a cause in fact of the plaintiffs harm. Morrison v. Kappa Alpha PSI Fraternity, 31805 (La.App. 2d Cir. 05/07/99), 738 So.2d 1105, writs denied, 99-1668 (La. 09/24/99), 747 So.2d 1120, 99-1607, *330 99-1622 (La. 09/24/99), 749 So.2d 634, 635. When multiple causes are present, a defendant's conduct is a cause in fact when it is a substantial factor in generating a plaintiffs harm. Id. Causation is a fact-specific inquiry and the issue to be resolved is whether the fact-finder's conclusion is a reasonable one. Id. A trial court's findings of fact will not be disturbed unless the record establishes that a factual, reasonable basis does not exist and the finding is clearly wrong or manifestly erroneous. Daye v. General Motors Corp., 97-1653 (La. 09/09/98), 720 So.2d 654. Where two reasonable views of the evidence exist, the fact-finder's choice between them cannot be manifestly erroneous or clearly wrong. Id.
Wyatt argues that, because the parties stipulated that Wyatt recommended termination of the plans in 1989, the trial court was manifestly erroneous in concluding that Wyatt caused plaintiffs' loss from that time. We cannot find that this fact is alone dispositive of the issue. While it is true that the parties stipulated to the fact Wyatt recommended termination of the plan no later than 1989, the record reveals additional facts which support the court's ultimate conclusion, namely, that Wyatt's negligence in communicating or providing necessary information caused plaintiffs to make an uninformed decision regarding the 1989 termination.
The record is clear that from the inception of the relationship, serious communication problems existed between plaintiffs and Wyatt. Thomas Victory ("Victory"), Clinic office administrator employed during 1987-1988, testified that Ruhl was hired to "help with th[e] communication problem" between the Clinic and Wyatt. He also classified the communication problem as "bad."
Dr. Frank Cline ("Cline") likewise stated that the communication problems between Wyatt and plaintiffs as early as 1987 precipitated the hiring of Ruhl. In describing the state of communication, Cline stated that the Clinic "[h]ardly ever heard from them [Wyatt]," and that the Clinic "didn't get replies as we wanted to...." He further explained that he expected advice from Wyatt regarding the plan's status, projection of future benefits and future contributions and the Clinic "couldn't seem to get that information from Wyatt."
It is apparent from the record that the communication problems continued even after the hiring of Ruhl. Ruhl testified that plaintiffs had difficulty in making the decision to terminate or continue the plan because they could not get information on the status of either overfunding or underfunding. This information was crucial to plaintiffs' decision to terminate or continue the plan and Ruhl testified that they "couldn't get any answers" regarding plan calculations. He clearly stated that "we needed to have ourto be able to make the decision on the merger or termination we needed some numbers to look at. Some calculations."
Both documentation, or the lack thereof, and Wyatt employees corroborated this testimony. Don Hezen, the Wyatt representative who handled the Clinic's account, testified that Wyatt did not do an analysis as to the economic effect of termination in 1989. He admitted that there was no "arithmetic" at all done to demonstrate how, on a bottom-line basis, the merger or termination of these plans would benefit or harm the doctors. In fact, he testified that there had never been any projections done with those kinds of issues in mind. Hezen also admitted that it was Wyatt's responsibility to take care of preparing the necessary documents for merger of the plans. This was not accomplished until almost eighteen months after the June 30, 1989 deadline. A July 2, 1990 letter from *331 Wyatt to Ruhl reflects Wyatt's obvious confusion as to its role in the merger or termination decision, as well as its failure to effect the legally-required action regarding the plans.
Plaintiffs' actuarial expert, Robert Fell ("Fell"), testified that in his opinion Wyatt should have conducted calculations regarding the ramifications of plan termination or merger in order to assist plaintiffs in making a decision and that one could not "realistically" make the decision as to whether or not to terminate the plan without those calculations. He opined that these calculations could be done only by an actuary. Fell felt that the only correspondence sent to the Clinic from Wyatt on August 26, 1988 failed to include a necessary cost analysis and he noted that a client reading the letter would "want more information" in order to make a decision to terminate or merge the plan.
Even defendants' actuarial expert, Richard Joss ("Joss"), admitted to "relationship reporting problems" in this case and that Wyatt "should have worked harder" on those troubles.
From this evidence, the trial court obviously concluded that Wyatt breached its duty to communicate or provide actuarial calculations to plaintiffs with reference to the 1989 plan decision. We can discern no manifest error in this conclusion. The generic recommendation that the plan be terminated no later than 1989 was alone insufficient to fulfill Wyatt's duty to plaintiffs. Both plaintiffs' and defendants' experts testified to shortfalls in Wyatt's communications with and furnishing actuarial calculations to the Clinic. Hezen admitted that those calculations did not exist during the time that the decision to terminate or merge the plan was to be made. Ruhl testified that he not only unsuccessfully sought to get that information from Wyatt but that the information was necessary to make a decision. Both Fell and Joss testified that termination of the plan would have been the most cost-efficient decision for the plan and that plaintiffs suffered financially as a result of the failure to terminate. From these facts, it is reasonable to conclude that Wyatt's negligent failure to communicate actuarial calculations solely caused plaintiffs' failure to terminate the plan in 1989 and the corresponding economic loss. Accordingly, we decline to disturb the fact-finder's conclusion regarding the 1989 decision.
Regarding the remaining years, Wyatt contends that it was plaintiffs' reliance on Ruhl's negligent advice which solely caused or superceded its negligence as the ultimate cause of the loss.[5] Obviously rejecting this argument, the trial court found that it was Wyatt's failure to provide accurate guidance and advice at every stage of the relationship which alone caused plaintiffs' damages. We find this conclusion reasonably supported by the record before us.[6]
Of course, a tort-feasor is liable only for damages caused by his negligent act. He is not liable for damages caused by a separate, independent or intervening cause. Broussard v. Razden, 98-2576 (La. App. 1st Cir. 12/28/99), 763 So.2d 644.
The record shows that three crucial pieces of information formed the crux of decision making in this case. Those included *332 actuarial calculations showing plan performance, PBGC interest rates and a ten-year plan participation rule which generally provided that maximum benefits would be derived only upon members' ten-year participation in the plan.
Until May 20, 1993, it was the actuarial calculations, or the lack thereof, which played the most important role in plaintiffs' decision making. Both the Clinic office administrator at the time, Debbie Garlington ("Garlington"), and Ruhl claimed to be unaware of any plan underfunding until that date. Indeed, correspondence from Wyatt to plaintiffs during 1990-1992 contains repeated assurances of plan overfunding, but no actuarial calculations. Of course, the lack of calculations is consistent with Hezen's testimony that no "bottom line" calculations reflecting plan performance were provided to plaintiffs until termination of the plan. This was obviously due to Hezen's belief that Wyatt's role changed when Ruhl came on board. As discussed earlier, Fell clearly classified such an omission as falling below the actuarial standard of care. Moreover, Joss testified that the plan began to experience underfunding as early as 1992 when he felt that perhaps the termination process should have begun.
As noted above, Ruhl consistently claimed that Wyatt's calculations were a necessary and influential part of his role with plaintiffs. The trial court obviously accepted Ruhl's testimony and rejected Wyatt's claim that its role had somehow changed. Moreover, until the plaintiffs became aware of the underfunding of the plan, it is fair to conclude that Wyatt's assurances and the lack of information regarding plan performance erroneously lulled Ruhl and plaintiffs into a sense of false security regarding the state of the plan and caused them to unwisely continue the plan. Under these circumstances, even if it is arguable that Ruhl possessed ultimate decision-making authority, the record shows that even those decisions were dependent upon the accuracy of Wyatt's information. Therefore, we cannot conclude that the trial court erred in finding that it was solely Wyatt's negligence in communicating information to plaintiffs which induced them to continue the plan even when employee liabilities were increasing and PBGC rates were declining.
After 1993, it was both the PBGC rates and the ten-year rule which became crucial factors in plan decisions. As noted above, it was then, although only after a phone call to Wyatt requesting the information, that plaintiffs apparently first became aware of plan underfunding in the employee account. Earlier, on January 7, 1993, Wyatt had sent plaintiffs a short letter which recommended termination of the plan because "[t]he assets in the plan may be about equal to all benefit liabilities...." Because no calculations were included in the recommendation to terminate, plaintiffs requested them. This request precipitated a May 20, 1993 correspondence from Wyatt to plaintiffs which again contained insufficient information to inform plaintiffs of plan performance, i.e., assets and liabilities. Indeed, it was this letter which defendants' expert, Joss, described as "a disaster." Accordingly, Garlington called Wyatt to get those numbers. Even so, both the recommendation to terminate and the calculations given by Wyatt were based upon plan rather than PBGC interest rates. In reality, this resulted in a substantial undervaluing of plan liabilities. Nevertheless, both Wyatt and plaintiffs remained unaware of the error until March of 1994. Despite Wyatt's recommendation to terminate the plan, plaintiffs opted to waive the physicians' accrued benefits to make up for the *333 shortfall in the employee account[7] and continue the plan through June 30, 1994the date of the members' ten-year participation.
Obviously, Wyatt argues that because plaintiffs failed to follow Wyatt's advice to terminate, it was Ruhl's negligent advice which became the ultimate cause of the damage. Certainly, the decision to continue the plan for another year caused additional underfunding due to the dropping PBGC interest rates. Nevertheless, in light of Ruhl's testimony that he relied on the correctness of the calculations submitted to plaintiffs by Wyatt and the clear evidence showing that Wyatt's numbers were incorrect, we cannot say that the trial court was clearly wrong in concluding that the erroneous information was a substantial factor in the uninformed decision and the ultimate loss, i.e., that "but for" the mistakes in calculation plaintiffs would have terminated the plan in 1993.
Moreover, Ruhl testified that another crucial factor in the decision to continue the plan was the ten-year rule. Ruhl claimed that the decision was based upon the "last calculation that Dr. Cline had received [from Wyatt] showing that for him to get his benefit in the plan we had to run the plan to 1994." The record shows that the so-called ten-year rule played a significant role in the entire decision-making process regarding the plan. Cline and Garlington testified that it was their belief they were bound by the ten-year rule in order to get maximum benefits from the plan, although neither witness could remember from where they first received that information. It was only Ruhl who identified Wyatt as the source of the ten-year rule advice and plaintiffs' beliefs regarding it. Both documentation and Hezen's testimony show that Wyatt did indeed explain the ten-year rule to the Clinic employees and Ruhl in a way which could have been interpreted to suggest that plaintiffs were somehow bound to keep the plan in effect for ten years in order to get the best financial benefit from it. In fact, May 19, 1992, monthly business meeting minutes of the Clinic reflect that after a discussion with the Wyatt corporation, the Clinic understood that the plan "may finally be terminated at the end of 10 years."
It is clear that communication surrounding the application of the ten-year rule was at best confusing or misleading. Nevertheless, because plaintiffs presented evidence showing Wyatt to have been the source of that information, the conclusion that it was Wyatt's breach of its duty to fully explain the ramifications of continuing the plan until June of 1994 which caused plaintiffs to unwisely continue the plan is a reasonable one. Therefore, from the record before us, we can discern no manifest error in the trial court's determination that Wyatt's negligence in communicating information (both incorrect interest rates and the ramification of the ten-year rule) to the plaintiffs solely caused plaintiffs' ultimate loss.
Accordingly, after reviewing the evidence regarding the parties' actions from 1989-1994, we reject Wyatt's argument that Ruhl's advice was the ultimate cause of the loss either as the sole or an intervening cause.

Damages
Wyatt next urges that the trial court abused its discretion in the damage award by assessing it with damages not caused by Wyatt's negligence, neglecting to account *334 for plaintiffs' failure to mitigate damages and awarding special damages which were not adequately proven by documentary evidence.

Damage Award
It is well settled that the trier of fact has much discretion in awarding damages. The discretion given the trier of fact is great, and even vast, so that an appellate court should rarely disturb an award of general damages. The appellate court's initial inquiry is whether the award for the particular injuries and their effects under the particular circumstances on the particular injured person is a clear abuse of discretion. Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994).
Wyatt first argues that the trial court erred in awarding damages for the costs of funding employee benefit expenses from 1989 to 1994, because those damages were a direct result of plaintiffs' unilateral decision to continue the plan in 1989. We cannot agree. We have previously determined that the record supports the conclusion it was Wyatt's negligence in communicating actuarial termination calculations which solely caused plaintiffs' failure to terminate the plan in 1989. As we noted earlier, the evidence, including Wyatt's expert's testimony, also shows that the failure to terminate the plan in 1989 ultimately caused plaintiffs' financial loss. From this evidence, it is reasonable to conclude that if plaintiffs had terminated the plan in 1989, additional employee costs would have been avoided. Accordingly, we find that the trial court acted within its broad discretion in awarding damages that included those employee costs.
Wyatt also argues that the trial court erred in awarding damages which resulted from the application of incorrect PBGC rates, because plaintiffs failed to prove that they relied on Wyatt's miscalculation. However, because we have earlier concluded that plaintiffs have shown their reliance on the incorrect PBGC calculations, we reject this argument as well.

Mitigation of Damages
The doctrine of mitigation of damages imposes upon the injured party a duty to exercise reasonable diligence and ordinary care in attempting to minimize his damage after the injury has been inflicted. The care and diligence required of him is the same as that which would be required by a man of ordinary prudence under like circumstances. 1900 Partnership v. Bubber, Inc., 27,475 (La.App. 2d Cir. 11/01/95), 662 So.2d 808. The burden rests with the wrongdoer to show that the victim of tortious conduct failed to mitigate damages. Hunt v. Long, 33-395 (La.App. 2d Cir. 06/21/00), 763 So.2d 811.
Wyatt argues that because plaintiffs knew they would incur additional employee costs each time they made the decision not to terminate the plan, they had the opportunity and ability to limit their damages by terminating the plan either in 1989 or 1993 and thereby failed to mitigate their losses. We cannot agree. Common sense reveals that full disclosure of both plan asset and liability information was required before an informed decision to terminate could be made. Therefore, while it may be true that plaintiffs had a general idea regarding increasing employee costs, it is equally clear that Wyatt either provided incorrect information or failed to provide specific information regarding actual plan performance, i.e., how those costs may have or may not have been offset by an increase in assets. Armed with only the general knowledge that employee expenses were increasing, we cannot find that a reasonably prudent *335 person would have made the decision to terminate the plans either in 1989 or 1993. Without full disclosure of other crucial factors required to make the decision to terminate, the most important of which Wyatt failed to provide, we cannot find that a duty to mitigate damages existed.

Special Damages
Wyatt also argues that the trial court erred in awarding $25,588 in "Clinic damages" because there existed insufficient proof of those damages. The record before us shows that the trial court divided the total damage sum, $589,920, between the physicians. It also reveals that the total sum included "a few thousand dollars" of Clinic damages which comprised the excise tax paid by plaintiffs as a result of the IRS audit and final costs of termination. The testimony of numerous witnesses showed that the total excise tax paid to the IRS was approximately $17,000. It was Garlington who testified that the Clinic expended an additional $6,000 for termination of the plan.
The breakdown of the Clinic damages set forth in Wyatt's brief is nowhere presented on the record before us. Accordingly, we are unable to review those specific calculations for error. Nevertheless, it is apparent that the trial court found the testimony relating to both the excise tax and termination costs to be credible. We decline to disturb this credibility determination and find the award of Clinic damages reasonably supported by the record.[8]

Bad Faith
Wyatt finally argues that the trial court erred in concluding Wyatt acted in bad faith. We agree that neither bad faith was alleged nor proven in this case. Nevertheless, we fail to see how this determination affected the ultimate damage assessment found in the final judgment. It is clear that the trial court completely relied upon Fell's damage model in measuring damages; this model included no bad faith damage calculations. The court's discussion of bad faith was contained only in the Reasons for Judgment. Of course, an appeal is from the judgment itself and not the reasons for judgment. Kirkham v. Pumphrey, 34,349 (La.App. 2d Cir. 12/20/00), 775 So.2d 634. Accordingly, we find it unnecessary to disturb this conclusion.

CONCLUSION
For the foregoing reasons, the judgment of the trial court is affirmed at Wyatt's costs.
AFFIRMED.
PEATROSS, J., concurs in result only.
NOTES
[1] The record shows that from October of 1991, PBGC interest rates began a steady decline through 1994.
[2] In a February 25, 1997 Order of Partial Dismissal, the Clinic and plaintiffs dismissed all claims against Central Bank.
[3] The Clinic assigned any amounts to which it might be entitled as the result of the suit to plaintiffs.
[4] Because evidence exists that additional omissions on the part of Wyatt caused a delay in the ultimate termination of the plan until 1996, it is arguable that prescription was suspended even after March of 1994.
[5] Notably, plaintiffs did initially sue only Ruhl.
[6] Under the circumstances of this case, we frankly admit some difficulty in the complete exoneration of Ruhl from liability. Nevertheless, because under the manifest error standard of review the conclusions reached by the trial judge are reasonably supported by the record, we may not substitute our conclusions for that of the trial court.
[7] PBGC requires that a plan be fully funded, i.e., assets equal liabilities, at termination. Nevertheless, in the case of an underfunded plan, two options are available to effect termination. Those include the making of additional non-tax deductible contributions to the plan or the waiver of benefit accruals by non-employee participants.
[8] Even assuming arguendo that the Clinic damages qualify as special damages, as Wyatt contends, we find the witness testimony adequate to qualify as "some evidence by which that loss can be reasonably measured." Eddy v. Litton, 586 So.2d 670 (La.App. 2d Cir. 1991), writ denied, 590 So.2d 1203 (La. 1992).