**BOARD OF TRUSTEES OF THE FIRE AND POLICE RETIREE HEALTH FUND, San Antonio and The Fire and Police Retiree Health Care Fund, San Antonio, Appellants,**

v.

**TOWERS, PERRIN, FORSTER & CROSBY, INC., Gary L. Gross, and Michael Rodriguez, Appellees.**

No. 04–04–00027–CV.

Court of Appeals of Texas, San Antonio.

Nov. 23, 2005.

Rehearing Overruled Feb. 2, 2006.

G. Wade Caldwell, Perry C. Robinson, Martin, Drought & Torres, Inc., San Antonio, for appellants.

George H. Spencer, Jorge E. Canseco, Clemens & Spencer, P.C., San Antonio, for appellees.

Sitting: CATHERINE STONE, Justice, PAUL W. GREEN, Justice (not participating), SARAH B. DUNCAN, Justice.

**OPINION**

SARAH DUNCAN, Justice.

The Fire and Police Retiree Health Care Fund, San Antonio and its Board of Trustees appeal the trial court's take-nothing judgment against them in their actuarial malpractice suit against Towers, Perrin, Forster & Crosby, Inc.; Gary L. Gross; and Michael Rodriguez. We hold the trial court correctly granted Towers Perrin's no-evidence motion for summary judgment on causation and acted within the ambit of its discretion in sustaining Towers Perrin's objections to the Fund's causation evidence. We therefore affirm the trial court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

"Because of the lasting health consequences associated with the stressful nature of the professions of firefighting and law enforcement," the Texas Legislature created the Fire and Police Retiree Health Care Fund "to provide health care benefits for persons who retired on or after October 1, 1989, from [certain] municipal fire or police department[s]. . . ." TEX.REV.CIV. STAT. ANN. art. 6243q, § 1.01 (Vernon 2003). An article 6243q fund is a statutory trust, *id.* § 1.04(a), that is administered by a board of trustees, *id.* § 1.04(b), composed of various city officials, two active firefighters and two active police officers, and retiree representatives of the fire and police departments. *Id.* § 2.01(a). Because the board of an article 6243q fund "administer[s] and hold[s] in trust the assets of the fund for the exclusive benefit of the beneficiaries of the fund," *id.* § 1.04(b), its "board has complete authority and power to . . . administer the fund for the exclusive benefit of the beneficiaries of the fund; . . . order payments from the fund; . . . independently control the fund; and . . . conduct all litigation on behalf of the fund." *Id.* § 3.01(a). The board also has final responsibility for the investment of the reserve funds, *id.* § 6.04(d), which are defined as all assets other than "a reasonably safe amount of surplus necessary to defray reasonable expenses of the fund." *Id.* § 6.03(a)-(b). So that a board may properly perform its duties, it is given statutory authority to enter into contracts with various professionals, including actu-

aries.[1] *Id.* § 6.05(a). "Membership in the fund," "[c]ontributions to the fund," and "[r]etirement health benefits" are determined in accordance with the collective bargaining agreements. *Id.* §§ 4.01, 4.02(a), 5.01.

The collective bargaining agreements involved in this case are those between the City of San Antonio and the firefighters' and police officers' unions—Local 624 International Association of Firefighters and the San Antonio Police Officers' Association. *See id.* §§ 1.02(4), 1.03 ("This Act applies to a paid fire and police department of a municipality with a population of 750,000 or more that has adopted Chapter 174, Local Government Code."). Accordingly, shortly after passage of article 6243q, these entities adopted collective bargaining agreements establishing the Fire and Police Retiree Health Care Fund, San Antonio and its governing Board (collectively, "the Fund").

Pursuant to its statutory authority, the Board retained Towers, Perrin, Forster & Crosby, Inc. "to provide . . . actuarial valuation[s] to determine the actuarial liability and appropriate pre-funding rate[2] for the Fund." One of these valuations, "conducted as of July 1, 2000," resulted in a report dated November 9, 2000. The 2000 Report is signed by a principal of Towers Perrin, Gary L. Gross. Also working on the project was Michael Rodriguez.

The 2000 Report recommended that, based on "[t]he assumptions outlined in Appendix B . . . and agreed upon by the [Board]," the pre-funding rates be 9.4% of the City's payroll and $20 per month for each employee. Based upon these assumptions and recommended pre-funding rates, the 2000 Report concluded it would take twenty-five years to amortize the Fund's $110,640,506 unfunded accrued liability.[3] The recommended pre-funding rate of 9.4% plus $20 was adopted by the City and the unions in their 2002 collective bargaining agreements.

In 2001, after a billing dispute with Towers Perrin, the Board engaged Rudd and Wisdom, Inc. to produce another actuarial evaluation of the Fund; this evaluation, which measured the Fund as of October 1, 2001, resulted in a report dated May 20, 2002. The 2002 Report concludes in part as follows:

1. The Fund will have a long term **inadequate financing arrangement** if monthly contributions remain at the present level of $20 per active participant and 9.4% of covered pay-

---

1. An actuary is "[a] statistician who computes insurance and pension rates and premiums on the basis of experience tables." BLACK's LAW DICTIONARY 34 (5th ed.1979).

2. The pre-funding or contribution rate is the amount contributed by the City and the police officers and firefighters to "pre-fund" their expected retiree health care benefits; the pre-funding rate is expressed in the collective bargaining agreements as a percentage of the City's payroll and a monthly contribution for an employee.

3. The Fund's unfunded accrued liability was explained in the 2000 Report:
   Prior to 1992, $117 per month was contributed for each active police officer and fire fighter to prefund the postretirement medi-

cal benefits for the members and their spouses. An actuarial valuation of the liabilities performed as of October 1, 1992 indicated that a prefunding rate of $341 (or 10.6% of payroll) was necessary to adequately fund the retireee medical liability. Because this was such a large increase, the parties involved agreed to gradually increase the contribution levels reaching the rate of 8.5% of payroll for police officers and $234 per active per month for fire fighters for the fiscal year beginning October 1, 1997. In 1997 Towers Perrin updated the valuation results and determined that a funding rate of 9.4% was appropriate.

roll by the City of San Antonio and if present health benefits are left unchanged.

2. In order to have an **adequate financing arrangement,** contributions will have to be significantly increased. Our **best estimate** is that effective October 1, 2002 total contributions should be increased to 13.94% of covered payroll assuming continuation of the active participant contribution of $20 per month.

    . . . .

6. The significant increase in the actuarially recommended level of contributions can be attributed primarily to changes in actuarial assumptions for (a) current annual health benefit claims costs, and (b) future annual increases in benefit claims costs (trend).

(emphasis in original). If the 13.94% pre-funding rate were adopted in the 2002 collective bargaining agreements, the City's contribution would increase by approximately $7.9 million. The 2002 Report also concluded that the Fund's unfunded accrued liability was $263,347,529. Although this unfunded accrued liability could be amortized in forty years at the recommended 13.94% pre-funding rate, it would take an "infinite" number of years to amortize the unfunded accrued liability at the present pre-funding rate of 9.4%.

Rudd and Wisdom's 2003 Report, which evaluated the Fund as of October 1, 2002 and which was dated January 21, 2003, presented a yet bleaker picture. According to the 2003 Report, the Fund's estimated liabilities would not be amortized over the long term unless the existing contribution rates were "substantially increased" to "19.93% of covered payroll in addition to the assumed continuation of the active participant contributions that would be made if the collective bargaining agreements in effect October 1, 2002 were to continue indefinitely ($20 per month for police officers and $70 per month for fire fighters after fiscal year 2003–2004)." The recommended pre-funding rate of 19.93% could be accomplished with a ten-year phase-in at 1.38% per year. Without the phase-in, the City's contributions would increase by approximately $20 million the first year.[4]

Alleging Towers Perrin's inaccurate estimates of health care costs and inaccurate conclusions regarding the necessary pre-funding rate proximately caused millions of dollars of damage to the Fund, the Fund filed suit against Towers Perrin, Gross, and Rodriguez (collectively, "Towers Perrin") for professional negligence. On March 17, 2003, in response to Towers Perrin's argument that the Fund lacked standing, the Fund's Board of Trustees intervened. Later that year, Towers Perrin filed a motion for summary judgment alleging there is no evidence on the following elements of the Fund's negligence cause of action:

a. There is no evidence that any Defendant failed to meet the applicable standard of care with regard to the estimated medical cost increases reflected in the Actuarial Study as of July 1, 2000;

---

4. According to the 2003 Report, this "significant increase" "can be attributed primarily to these changes: (a) the change in the amortization period from 40 years to 30 years, (b) the change in the payroll increase assumption from 7% to 6% per year, (c) the 1% increase in assumed annual increases in future benefit claims costs (trend) for the first 9 fiscal years after the valuation date, (d) the 5% increase in assumed benefit claims costs for the fiscal year ending September 30, 2002, and (e) the change in the investment return assumption from 8.5% to 8.25% per year." "Another source of increase in the recommended contribution rate was adverse experience (worse than assumed) during fiscal year 2001–2002, including both adverse investment experience and adverse claims costs."

b. There is no evidence that any Defendant failed to meet the applicable standard of care with regard to the estimated claims and administrative expenses reflected in the Actuarial Study as of July 1, 2000;

c. There is no evidence that any claimed failure of any Defendant to meet the applicable standard of care with respect to the sensitivity tests provided for under certain circumstances by Actuarial Standard of Practice 6, and/or with Defendant Towers Perrin's own internal policies relating to one method available for the development of a claims cost assumption was a proximate cause of damage to the Plaintiff or the Intervenor;

d. There is no evidence that any claimed negligent act or omission of any Defendant was a proximate cause or an actual cause of damage to the Plaintiff or the Intervenor;

e. There is no evidence that any Defendant failed to meet the applicable standard of care by failing to include in the Actuarial Study as of July 1, 2000 the recommendation that an increase in the funding to 15.39% was needed to amortize the unfunded actuarial accrued liability of the Plaintiff or the Intervenor;

f. There is no evidence that any Defendant failed to meet the applicable standard of care by failing to conclude in the Actuarial Study as of July 1, 2000 that the Plaintiff or the Intervernor had an unfunded actuarial accrued liability of $263,347,529;

g. There is no evidence that the Plaintiff or the Intervenor [has] sustained any legally recoverable damages as a result of anything any of the things Defendants allegedly did or failed to do; and

h. There is no evidence that the Plaintiff or the Intervenor [has] sustained any damages in connection with the matters in controversy in this case which are not wholly speculative.

After ruling on Towers Perrin's objections to the Fund's and its Board's summary judgment evidence, the trial court granted Towers Perrin's motion for summary judgment on all eight grounds and rendered a take-nothing judgment. The Fund appealed.

## APPLICABLE LAW

A professional malpractice claim is "based on negligence." *Cosgrove v. Grimes*, 774 S.W.2d 662, 664 (Tex.1989) (attorney malpractice). In an action for negligence, "[t]he plaintiff must prove that there is a duty owed to him by the defendant, a breach of that duty, that the breach proximately caused the plaintiff injury and that damages occurred." *Id.* at 665. "The two elements of proximate cause are cause in fact (or substantial factor) and foreseeability." *IHS Cedars Treatment Ctr. of Desoto, Texas, Inc. v. Mason* 143 S.W.3d 794, 798 (Tex.2004). "These elements cannot be satisfied by mere conjecture, guess, or speculation." *Id.* at 798–99. "Cause in fact is established when the act or omission was a substantial factor in bringing about the injuries, and without it, the harm would not have occurred." *Id.* at 799. In an accountant malpractice case, "[e]xpert testimony is usually necessary to establish ... the causal link between the plaintiff's damages and the accountant's negligence." *Greenstein, Logan & Co. v. Burgess Mktg., Inc.*, 744 S.W.2d 170, 185 (Tex.App.-Waco 1987, writ denied) (citing *Kemmerlin v. Wingate*, 274 S.C. 62, 261 S.E.2d 50, 51 (1979)).

## CAUSATION

The Fund argues the trial court erred in granting a summary judgment against it

on causation because "[t]here is more than a scintilla of evidence from which a jury could reasonably infer the Health Fund was damaged as a result of [Towers Perrin's] negligent 2000 Study." We disagree.

### Standard of Review

We review a summary judgment de novo. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 156 (Tex.2004). We will therefore reverse an order granting a "no evidence" motion for summary judgment under Rule 166a(i) only if the respondent produced summary judgment evidence raising a genuine issue of material fact on each challenged element. *See* Tex.R. Civ. P. 166a(i). "When reviewing a summary judgment, we take as true all evidence favorable to the [respondent], and we indulge every reasonable inference and resolve any doubts in the [respondent's] favor." *Joe*, 145 S.W.3d at 157.

### Discussion

█ To support its argument, the Fund points to "evidence showing the City and the unions relied on past Towers Perrin studies to determine the contribution rate and that higher pre-funding rates probably would have been adopted if they had been known" and asserts this evidence "is identical to the permissible predicting in *Greenstein* [, *Logan & Co. v. Burgess Mktg., Inc.*, 744 S.W.2d 170 (Tex.App.-Waco 1987, writ denied) ]." Contrary to the Fund's assertions, however, this case is entirely unlike *Greenstein*.

In *Greenstein*, the plaintiffs—Burgess Marketing, its principal owner Jack Burgess, and his wife—sued Burgess Marketing's accounting firm, Greenstein, Logan & Company, for accounting malpractice. *Id.* at 177. The plaintiffs alleged, and the jury found, that Greenstein Logan's negligent failure to discover during its 1984 and 1985 audits that Burgess Marketing had under-paid its federal excise tax proximately caused Burgess Marketing $3.5 million in damages. *Id.* On appeal, the court rejected Greenstein Logan's challenge to the sufficiency of the evidence to support the jury's proximate cause finding, holding "[t]he jury could have reasonably concluded ... that the negligent failure of Greenstein Logan to perform the 1984 and 1985 audits in accordance with generally accepted auditing standards was a substantial factor in bringing about Burgess Marketing's bankruptcy, and that the damage would not have occurred but for such negligence" from evidence that, "as soon as the underpayment was discovered," "Burgess Marketing immediately resumed paying the correct federal excise tax each month"; "Burgess immediately increased prices on non-gasoline items sold at [its] convenience stores"; Burgess "imposed stringent cost controls"; and "[t]hese management decisions resulted in the company's operations again becoming profitable within six months." *Id.* at 186. According to the plaintiffs' experts, "if Greenstein Logan had discovered the underpayment during the 1984 audit when the company's liability was only $287,229, Burgess could have then made the same management decisions which *he* later made." *Id.* (emphasis added).

As indicated by the emphasized "he" in the previous sentence, Burgess was the principal owner of Burgess Marketing and thus able to cause the company to "resume[ ] paying the correct federal excise tax each month"; "increase[ ] prices on non-gasoline items sold at [its] convenience stores"; and "impose[ ] stringent cost controls"—unilaterally and immediately. In this case, on the other hand, the City and hundreds of union members must negotiate the pre-funding rate during the collective bargaining process; neither can unilaterally or immediately change the pre-

funding rate. Indeed, when Towers Perrin recommended a significant increase in the pre-funding contribution rate to 10.6% in 1992, that recommendation was not followed; instead, a contribution rate of 8.5% by October 1997 was adopted. And that 2.1% difference pales in comparison to the difference between the 9.4% pre-funding rate adopted in the 2002 collective bargaining agreements and the 13.94% and 19.93% rates recommended in the 2002 and 2003 Reports, which represented increases for the City of $7.9 million and $20 million, respectively. As a result, as Towers Perrin points out, any "evidence that [the] City and the Firefighters Union *previously* followed Towers Perrin's recommendations is not competent evidence that these entities ... would have agreed in the collective bargaining process to ... raise contribution rates." Towers Perrin also points out yet another significant distinction between *Greenstein* and this case: Unlike Burgess Marketing, which was legally required to pay its excise taxes, the City and the unions were not required to raise contribution rates, legally or otherwise; they had simply "agreed in principle, in 1995, that, once an actuarially sound fund was established by current contribution levels, the responsibility for future contributions ... would be jointly shared by the parties, and would be quantified and allocated by negotiation in future agreements, as necessary." In short, this case is entirely unlike *Greenstein.*

The Fund also cites *The Orthopaedic Clinic of Monroe v. Ruhl,* 34,700 (La.App. 2 Cir. 5/11/01), 786 So.2d 323, writ denied, 2001–1727 (La.10/5/01), 798 So.2d 970. Again, however, the evidence in *Ruhl* was held to be sufficient to establish causation because the record included testimony from both the plaintiffs' and the defendants' experts "that [the] plaintiffs suffered financially *as a result* of the failure to terminate," which was caused by the

defendant actuary's failure to timely provide the needed actuarial calculations. 786 So.2d at 331 (emphasis added). No such testimony appears in this summary judgment record.

The Fund also argues there is "expert evidence of causation" and points to the affidavits of Dr. Carl M. Hubbard and Lawrence Mitchell and the deposition testimony of Robert May. Hubbard authored a report that concluded the economic loss to the Fund of using the contribution rates recommended by Towers Perrin and agreed to in the 2002 Firefighters' Collective Bargaining Agreement instead of the rate recommended in the Rudd and Wisdom 2002 report is $16.5 million. Mitchell and May concluded that Towers Perrin's conduct fell below the standard of care and resulted in a recommended pre-funding rate in the 2000 Report that was too low. As evidenced by their conclusions, however, Hubbard, Mitchell, and May testified on the issues of breach and damages. None even purported to testify on causation, *i.e.,* if Towers Perrin had recommended a higher pre-funding rate, it would have been adopted by the City and the unions in collective bargaining agreements. Because the summary judgment record does not contain even a scintilla of evidence on this issue, we hold the trial court correctly granted a no-evidence summary judgment against the Fund on causation.

### OBJECTIONS TO SUMMARY JUDGMENT EVIDENCE

The causation issue was addressed in the affidavits of George Suther and John Anderson Jr.; but Towers Perrin's objections to this evidence were sustained. Accordingly, in its final issue, the Fund argues the trial court abused its discretion in sustaining Towers Perrin's objections to certain of the Fund's summary judgment evidence. In light of our holding that the

trial court correctly granted a no-evidence summary judgment against the Fund on causation, we address only the propriety of the trial court's rulings on the objections to the affidavit testimony of the two witnesses offered by the Fund to establish causation—George Suther and John Anderson Jr.

### Standard of Review

We review a trial court's evidentiary rulings under the abuse of discretion standard. *See United Blood Servs. v. Longoria,* 938 S.W.2d 29, 30 (Tex.1997).

### Discussion

■ Anderson was the firefighters' union's chief negotiator in the 2002 collective bargaining process. He testified that he is "familiar with the history of the negotiations with the City of San Antonio over the funding of the ... Fund;" both the union and the City "relied on the recommendations of Towers Perrin" in negotiating the 1999 and 2002 collective bargaining agreements; and, "given the long history of relying on the Towers Perrin recommended contribution rates, and the history of [the union] and the City of San Antonio adopting these rates, it is my opinion, which I believe is well founded, that there is a reasonable certainty that [the union] and the City of San Antonio would have adopted higher contribution rates in the 2002 Firefighters CBA if it had been known that the contribution rates recommended in the 2000 Towers Perrin study were too low." Suther, president of the firefighters' union and one it's the lead negotiators in the negotiations leading up to the firefighters' 2002 collective bargaining agreement, testified to the same effect. The trial court sustained Towers Perrin's objection that this testimony was "opinion testimony by a person never designated as an expert witness on this topic by the

[Fund] under the controlling provisions of [the] Court's Scheduling Order entered on April 23, 2003." The Fund does not argue that it designated Anderson and Suther as expert witnesses; rather, the Fund argues it was not required to designate them "as experts in order [for them] to give [their] opinion on matters which involve lay testimony." In support of its argument, the Fund cites Texas Rule of Evidence 701.

■ Rule 701 provides as follows:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Tex.R. Evid. 701. "The perception underlying the lay witness's testimony may be what was seen, heard, smelled, tasted, touched or felt." *State v. Brainard,* 968 S.W.2d 403, 412 (Tex.App.-Amarillo 1998) (citing Hulen D. Wendorf, et al., Texas Rules of Evidence Manual VII–5 (3d ed.1991)), *aff'd in part and rev'd in part on other grounds,* 12 S.W.3d 6 (Tex.1999). Thus, "Rule 701's requirement that the testimony be based on the witness's perception presumes the witness observed or experienced the underlying facts, thus meeting the personal-knowledge requirement of [R]ule 602." *Turro v. State,* 950 S.W.2d 390, 403 (Tex.App.-Fort Worth 1997, pet. ref'd) (citing *Bigby v. State,* 892 S.W.2d 864, 889 (Tex.Crim.App.1994), *cert. denied,* 515 U.S. 1162, 115 S.Ct. 2617, 132 L.Ed.2d 860 (1995)). "A *speculative opinion,* such as an opinion on what someone else was thinking at a specific time, does not help the jury to either (1) understand the witness' testimony better, or (2) decide the question of the other person's intent. Mere conjecture does not assist the jury." *Fairow v. State,* 920 S.W.2d 357, 361 (Tex.

App.-Houston [1st Dist.] 1996), *aff'd*, 943 S.W.2d 895 (Tex.Crim.App.1997). "Speculate" means "to take to be true on the basis of insufficient evidence." Webster's Ninth New Collegiate Dictionary 1133 (Merriam–Webster Inc.1988).

We hold the Rule 701 test is not met by Anderson's and Suther's causation testimony. This testimony was based not on their perceptions but on their speculative conclusions regarding what the City's negotiators, the members of the San Antonio City Council, and hundreds of members of the firefighters' union would have done if Towers Perrin had recommended a higher pre-funding rate. Accordingly, we hold the trial court did not abuse its discretion in sustaining Towers Perrin's objections to this testimony.

### Conclusion

Because the summary judgment evidence fails to raise a genuine issue of material fact on causation, the trial court correctly granted Towers Perrin's motion for a no-evidence summary judgment on this ground. And the trial court properly sustained Towers Perrin's objections to the only evidence tendered by the Fund on the causation issue because it is based not on perception but speculation. We therefore affirm the trial court's judgment.